[No. 4130.   Decided March 10, 1902.]

ELLA M. STANLEY, *Respondent*, v. WILLIAM M. STANLEY *et ux.*, *Appellants*.

WITNESSES — COMMUNICATIONS BETWEEN ATTORNEY AND CLIENT — COMPETENCY.

The rule making communications between attorney and client privileged from disclosure on the witness stand does not apply to testimony by the attorney disclosing by whom he was employed in the management of a case.

SAME — HARMLESS ERROR.

The admission of testimony by an attorney as to the wealth of parties in the case who had employed him in another action is harmless error, where the same fact has been shown by other and proper evidence.

HUSBAND AND WIFE — ALIENATION OF HUSBAND'S AFFECTIONS — ACTION BY WIFE — HUSBAND INCOMPETENT AS WITNESS.

A husband called as a witness against his wife in an action brought by her is incompetent to testify over her objection, under Bal. Code, § 5994, which provides that a husband shall not be examined for or against his wife without the consent of the wife.

SAME — EVIDENCE — DECLARATIONS   MADE   SUBSEQUENT TO   SEPARA-
TION.

In an action by a wife against her husband's parents for dam-
ages for alienating his affections, declarations by the husband
showing affection for the wife, made six months after the action
was begun and long after the separation of husband and wife
had occurred, are inadmissible in evidence.

SAME — FAILURE OF PROOF.

In an action by a wife against her father-in-law for alien-
ating her husband's affections, a verdict against defendant is un-
warranted where there is no evidence of malice toward plaintiff,
or that he had anything to do with the separation of husband
and wife, and the evidence merely shows that he did not desire
his son to live with plaintiff, employed an attorney to· procure
a divorce from her, and threatened to disinherit his son if he
returned to live with plaintiff, but there is no showing that this
threat was communicated to the son or that the employment
of the attorney was not at the request of the son.

APPEAL — SUFFICIENCY OF EVIDENCE.

The verdict of the jury upon a question properly submitted
to them will not be disturbed, where there is conflicting evi-
dence.

Appeal from Superior Court, King County.—Hon.
GEORGE MEADE EMORY, Judge. Reversed.

*Lewis, Hardin & Albertson,* for appellants.

*W. F. Hays,* for respondent.

The opinion of the court was delivered by

MOUNT, J.—Appellants are husband and wife; the
respondent is their daughter-in-law. This action was
brought by the plaintiff in the court below (respondent
here) to recover damages from the defendants for alien-
ating the affections of the husband of plaintiff. The
cause was tried before the court and jury, and a verdict
and judgment for $8,000 resulted in favor of respondent.
From this judgment appeal is prosecuted.

Errors were alleged as follows: (1) That the trial court erred in permitting certain evidence of John Arthur, an attorney employed by appellants. Mr. Arthur, after testifying that he was an attorney at law, stated that in the winter of 1898-99 he was employed by the appellants to bring and conduct a suit for divorce in a case wherein John Stanley, appellants' son, was plaintiff, and the respondent was defendant; that the complaint was prepared upon information furnished by appellants, and also upon information obtained from the court records in another case between respondent and her husband; that he had never seen John Stanley until his parents brought him into Arthur's office the day before the complaint in the divorce case was filed, viz., about July 5, 1899. This testimony was simply that he was employed by the appellants, William Stanley and Sarah E. Stanley, and prepared the complaint in Stanley v. Stanley upon information furnished by appellants, subsequently verified by the court's records in another case. He did not testify, nor was he asked to state, what this information was. The rule is well settled that an attorney is not privileged from disclosing by whom he was employed in the management of a case. Greenleaf, Evidence, § 245; Weeks, Attorneys, 321; 2 Rice, Evidence, 644; *Chirac v. Reinicker,* 11 Wheat. 280; *Satterlee v. Bliss,* 36 Cal. 489; *Gower v. Emery,* 18 Me. 79; *Brown v. Payson,* 6 N. H. 443; *Mobile & M. Co. v. Yeates,* 67 Ala. 164; *Williams v. Blumenthal,* 27 Wash. 24 (67 Pac. 393). All the authorities cited by appellants upon this point go to the question of communications made by the client to the attorney, or advice given thereon, in the course of professional employment. As to such communications there is no great conflict of au-

thority.   But, as we have seen above, this question is
not involved here.   No communication of this charac-
ter was sought or disclosed.   The question simply was
as to who employed Mr. Arthur in the divorce case of
Stanley *v.* Stanley.   As to this he was obliged to answer,
and no error was committed by the lower court in this
respect.

2. Appellants next allege error of the court in per-
mitting John Arthur to testify concerning the wealth of
appellants, for the reason that this information was ob-
tained in a confidential manner.   It is questionable from
the record whether this point can be raised upon this
appeal, because no objection was made to it upon that
ground.   However that may be, there were other wit-
nesses who testified as to the wealth of appellants with-
out objection, and no question was raised here as to the
materiality of that evidence.   Hence, even if it was
error to admit the evidence of Mr. Arthur, the error
was harmless, because there was proper evidence upon
this subject much stronger than the evidence of Mr.
Arthur.

3. John Stanley, the son of appellants, and the hus-
band of the respondent, was called as a witness for the
appellants (defendants below), and asked the following
question:   "Did you ever hear your mother, in the pres-
ence of your wife, or anybody else's presence, say that
you would not have a dollar of your father's money if
you went back to your wife?"   This question was ob-
jected to on the ground that under the statute the witness
was disqualified from testifying against his wife.   The
objection, we think, was properly sustained, under the
statute (§ 5994, Bal. Code), which provides:

"The following persons shall not be examined as wit-
nesses:   (1) A husband shall not be examined for or

against his wife without the consent of the wife," etc.

In this case the wife was the plaintiff, suing the mother and father of her husband. The husband was called as a witness against the wife, and she objected to her husband testifying. Such witness falls squarely within the inhibition of the statute. *State v. Halbert,* 14 Wash. 306 (44 Pac. 538); *Speck v. Gray,* 14 Wash. 589 (45 Pac. 143).

4. Mrs. Cole, a witness for plaintiff, was permitted, over the objection of the appellants, to testify that in August, 1900, she heard a conversation between plaintiff and her husband, John Stanley, in which conversation John Stanley asked plaintiff "to go and live with him; but he did not want his parents to know about it. At that time he had her sitting on his lap, and kissed her and embraced her. She refused." It is claimed that the court erred in permitting this evidence. The separation between respondent and her husband occurred July 5, 1897. This action was begun in February, 1900. This conversation occurred more than two years after the separation, and some six months after the action was begun. It was not shown in the record, nor attempted to be shown, that the appellants ever authorized or knew anything about this conversation. This evidence shows an affection of the husband for the wife at the time the conversation occurred, and also that the husband at that time desired to live clandestinely with her, without the knowledge of his parents. The inference is that the appellants caused the separation, and were adverse to the husband's society with his wife. It is well settled that acts and declarations of the husband in a case like this may be shown at and prior to the time of separation, for the purpose of showing affection. 1 Greenleaf, Evidence

(16th ed.), § 162d; *Lockwood v. Lockwood,* 67 Minn.
476 (70 N. W. 784); *Williams v. Williams,* 20 Colo.
51 (37 Pac. 614); *Baker v. Baker,* 16 Abb. N. C. 293;
*Rubenstein v. Rubenstein,* 69 N. Y. Supp. 1067.   What-
ever may be shown before separation is for the purpose
of showing affection at the time of separation.   Declara-
tions of either husband or wife, made so long after the
separation as not to be a part of it, cannot be competent
against defendants.   In the case of *Rubenstein v. Ruben-
stein, supra,*—a case like the one now under considera-
tion,—the court said:

"A letter written to the plaintiff by her husband was
offered to show the existence of affectionate relations be-
tween them, and it was admitted on the ground that it
had some bearing upon the question of damages.   It was
not admissible for any purpose.   It was written two years
or more after this action was begun.   A letter of that
character, if written while the parties were living to-
gether, might have been admissible to show that the
plaintiff and her husband, prior to any alleged act of
interference on the part of the defendant, were living in
harmonious relations; but her husband's declarations,
made so long after the action was begun, were not com-
petent against the defendant."

In the case of *Fratini v. Caslini,* 66 Vt. 273 (29 Atl.
252, 44 Am. St. Rep. 843), the court says:

"Defendant also offered to show generally her com-
plaints and declarations of and concerning her husband's
treatment of her, made after trouble began as aforesaid,
but was limited in time to those made before trouble be-
gan; and this was right."

In the case of *Preston v. Bowers,* 13 Ohio St. 1 (82
Am. Dec. 430), it is said:

"The plaintiff had a right to give the declaration of
his wife in evidence, to show the state of her affections

toward him recently before the alleged seduction.    But
the exercise of a right and the abuse of a right are two
very different things.    The words and acts of the de-
fendant, Griffin, reported by the wife to the husband,
and detailed by him in evidence to the jury, were nothing
but hearsay, and, in themselves, clearly inadmissible."

In 1 Phillips, Evidence (3d ed.), p. 189, the rule is
stated as follows:

"In cases where it is material to inquire into the de-
meanor, the conduct, and mental feelings of an individual
at a particular period, the expressions used by the in-
dividual at the period in question are, in their nature,
original evidence.    For they are the thing itself which
is inquired into, as far as outward behavior is important;
and as evidence of inward sentiments, that are unlike a
statement of past occurrences, for they derive their credit
from being usually identified with, and naturally result-
ing from, particular corresponding feelings.    According-
ly, in actions for criminal conversation, where it is mate-
rial to inquire into the terms, upon which the husband
and wife lived together before the connection of the wife
with the defendant, it is usual to give evidence of what
the husband and wife have said to each other, in order to
show their demeanor and conduct, and whether they were
living upon better or worse terms.    With the same ob-
ject, evidence has been given of the anxiety expressed by
the wife about her hsuband, and of her mode of speak-
ing of him in his absence.    On the other hand, it is ad-
missible to give general evidence, in reduction of dam-
ages, that the wife had complained of her husband's
treatment.    The letters of the wife to the husband, or,
as it has been recently decided, the letters of the wife to
a third person with reference to her husband, are evidence
to show what her feelings were towards him.    In such
cases the jury do not substitute the knowledge of an
absent person for their own, but they reason as from an
effect to a cause.    It is, however, always required that
proof should be given that the declarations or letters of

a wife, purporting to express her feelings, were of a time antecedent to the date of any facts calculated to raise suspicion of a criminal intercourse, and when there existed no ground of imputing collusion. It has been held that the letters of the wife are inadmissible if written after an attempt to commit adultery by the defendant."

See, also, 1 Greenleaf, Evidence (16th ed.), § 162d; 1 Wharton, Evidence (3d ed.), § 225; *White v. Ross*, 47 Mich. 172 (10 N. W. 188); *Huling v. Huling*, 32 Ill. App. 519; *Preston v. Bowers*, 13 Ohio St. 1 (82 Am. Dec. 430). It is said in *Frantini v. Caslini, supra*:

"This rule, and the reason of it, are as applicable to the counts for alienating affections as to the count for criminal conversation, for the cause of action is the same in all, namely, the loss of *consortium*,"—

citing *Daley v. Gates*, 65 Vt. 591 (27 Atl. 193); *Cross v. Grant*, 62 N. H. 675 (13 Am. St. Rep. 607). The cases cited by respondent are not opposed to the rule announced in the authorities above cited. The case of *Williams v. Williams, supra*, was a case where the declarations of the husband were all made prior to or at the time of the separation. The court says:•

"It is true his mere declarations [referring to the declarations of the plaintiff's husband] were not admissible to show what his mother's conduct was, nor was it, of itself alone, material how bad his mother's conduct was toward plaintiff; for, no matter how bad her conduct was, she could not properly be held liable in this action unless the effect of her conduct was such as to cause Edward [the husband] to become estranged from and desert his wife. From the record it clearly appears that the trial court was careful to place the declarations of the husband upon this ground. Thus limited, it was not error to admit proof of his declarations."

In the case of *Lockwood v. Lockwood, supra*, the declarations of the husband received in evidence were declar-

ations made not later than the day of separation.   The
court says:

"The evidence, in connection with that which we have
already quoted in this opinion in relation to plaintiff's
husband separating from her, was proper to be submitted
to the jury, as it was almost coeval with some of their
acts of wrongdoing and the time of the separation, and
might be properly regarded as a part of the *res gestae*."

The declarations of John Stanley were made long after
the separation from his wife, and six months after this
action was begun.   The inference that the separation
was caused by the appellants was damaging to them, and
it was error for the court to admit this evidence.

5. Upon the question whether the payment of the $200,
as alleged by appellants, was in settlement of the cause
of action, it is only necessary to say that this was a question
for the jury.   While it appears to us that the evidence
shows a settlement, yet this question was properly sub-
mitted to the jury, and this court will not weigh the evi-
dence to determine the correctness of the verdict.

6. The evidence in the case discloses substantially that
the plaintiff and John Stanley were married on January
29, 1897.   On the day previous to this the plaintiff had
caused the arrest of John Stanley.   Sarah E. Stanley,
one of the appellants here, and the mother of John Stan-
ley, as soon as she heard that her son was in jail, sent
for respondent, and consented to a marriage between re-
spondent and her son.   This marriage occurred on the
date named.   At this time respondent was about twenty-
one years of age, and John Stanley, her husband, was
about the same age,—possibly some older.   Within a few
days after the marriage respondent and her husband went
to live with the family of appellants, which consisted at
that time of two daughters, nearly grown, besides the

respondent and her husband.   William M. Stanley, the other appellant, and the father of John Stanley, was at this time in Alaska, where he had been for several months.   He knew nothing of the marriage until after his return.   Respondent and her husband got along nicely for a month or so, when frequent quarrels began to take place in the family, principally between the appellant Mrs. Sarah Stanley and respondent.   In some of these quarrels the appellant Sarah E. Stanley threatened the respondent that, if her husband, William M. Stanley came back from Alaska with money, she would take respondent's husband away from her.   In the latter part of June, 1897, appellant Sarah E. Stanley turned respondent and her husband out for themselves.   A few days after this a child was born to the respondent.   When the child was about a week old, viz., on July 5, 1897, respondent's husband left her.   He remained for a short time with his mother at their home, and soon after left for Alaska.   Appellant Sarah E. Stanley, after she had turned respondent and her husband out for themselves, furnished groceries and provisions for the respondent, and frequently took meals to her.   On July 17, 1897, the appellant William M. Stanley returned from Alaska.   Prior to his return from Alaska, the family had been in poor circumstances financially, and appellant Sarah E. Stanley had been compelled to work for her neighbors to obtain a livelihood for her family.   Appellant William M. Stanley had been successful in mining ventures in Alaska, and returned quite wealthy.   On the 26th day of August, 1897, the respondent brought an action against her husband, John Stanley, for separate maintenance, which action is still pending.   It was soon after this action for separate maintenance was begun that respondent's husband left

for Alaska, where he remained until about July 5, 1899. Soon after John Stanley left for Alaska, his father, William M. Stanley, called to see the respondent while she was sick, and kissed her, saying "he would kiss her for his son in Alaska; and got her some oysters, which she craved." Along about December, 1898, appellants employed an attorney to procure for their son a divorce from respondent. A divorce was granted in the lower court, and subsequently, on appeal, reversed in this court. *Stanley v. Stanley,* 24 Wash. 460 (64 Pac. 732). There was some evidence that both appellants, after the separation of respondent and her husband, made statements to the effect that if their son should return to live with respondent, they would disinherit him; but there is no direct evidence that any such statements were made to the son, or in his presence. These statements, however, were denied by the appellants. In the case of *Young v. Young,* 8 Wash. 81 (35 Pac. 592), this court said:

"Appellants were under no legal obligation to provide a home either for her [meaning respondent in the action] or her husband. And granting that they drove her away without provocation, and simply permitted but did not persuade or otherwise influence their son, her husband, to remain with them, still no action can be maintained against them therefor. While the appellants would have no right to prevent their son from following his wife wherever she might choose to go, they certainly would not be liable in an action for damages by reason of his refusing to do so, without proof that such refusal was the result of the exercise of some improper influence by them."

In *Tucker v. Tucker,* 74 Miss. 93 (19 South. 955, 32 L. R. A. 623), the court says:

"In every suit of this character the principal inquiry is, from what motive did the father act? Was it mali-

cious, or was it inspired by a proper parental regard for the welfare and happiness of his child? The instinct and conscience unite to impose upon every parent the duty of watching over, caring for, and counseling and advising the child at every period of life, upon marriage and after marriage, whenever the necessities of the child's situation require or justify such action on the parent's part. The reciprocal obligations of parent and child last through life, and the duty of discharging these divinely implanted obligations is not and cannot be destroyed by the child's marriage. Multiplied instances will occur to the mind in which a failure of the father to speak and act would be regarded with horror. A daughter who has recklessly contracted an undesirable marriage with a man utterly unworthy to be the husband of a virtuous woman, against the wish and over the vigorous protest of the father, and who has, by such ill-starred union, been brought to wretchedness and humiliation and want of the ordinary comforts of life, may surely be advised, counseled, and cared for in the parental home, even against the will and expressed wish of the unfaithful husband. The question always must be, was the father moved by malice, or was he moved by proper parental motives for the welfare and happiness of his child?"

There is a wide distinction between an action by husband or wife against the parent of either and one against some stranger, who invades the domestic circle and separates husband and wife. *Tucker v. Tucker, supra,* and authorities cited. There is certainly no evidence in the record which shows, or has even a tendency to show, that the appellant William M. Stanley had any malice toward respondent, or had, or could have had, anything at all to do with the separation of his son and respondent. On the other hand, it appears that he was very kind to his daughter-in-law for a long time after the separation. The most the evidence shows against him is that he did not desire his son to live with respondent, and employed an

attorney to obtain a divorce from her, and said he would disinherit his son if he returned to live with respondent. But it is not shown that this was communicated to the son, or that the son did not request him to employ the attorney for the purpose of procuring the divorce.    There is no evidence in the case supporting the allegations against appellant W. M. Stanley.    The motion for a non-suit as to him should have been sustained.

For the reasons above given the cause will be reversed, with instructions to the lower court to grant a non-suit as to the appellant William M. Stanley and a new trial as to the other appellant.

REAVIS, C. J., and ANDERS, WHITE, DUNBAR, HADLEY and FULLERTON, JJ., concur.